UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>HAYNER,<br>Defendant. | Case No. 16-cr-00432-EDL-1 (VC)<br><br>**OPINION** |

      After being fired from a volunteer position, Timothy Hayner texted his former supervisor, John Muir, that their mutual boss, Bill Doll, needed to die. Muir took the threat seriously and reported it. Because these people worked for a federal agency, Hayner's threat to kill Doll potentially violated a federal regulation that makes it a misdemeanor to interfere with the functions of a federal agency. The United States Attorney's Office charged Hayner in federal court with violating this regulation.

      Following a bench trial, a federal magistrate judge found Hayner guilty. Hayner appeals his conviction to this Court, arguing that the government did not prove, as required by the First Amendment, that his texts constituted a "true threat." Among other things, Hayner argues his texts were not a true threat because he did not intend for his threat to be taken seriously.

      In a criminal case involving threatening speech by a defendant, the appellate court must make its own determination whether the government proved beyond a reasonable doubt that the defendant's speech was a true threat. With narrow exceptions that are not applicable here, the appellate court gives no deference to the trier of fact on this constitutional issue. Because this Court concludes that the evidence at trial did not establish beyond a reasonable doubt that

Hayner intended for his texts to be taken seriously, his conviction is reversed.

I

Timothy Hayner was a volunteer at the San Francisco Maritime National Historical Park, where he helped maintain boats. John Muir, an employee at the park, supervised the volunteers. Hayner and Muir occasionally spent time together outside of work, and they texted about topics both personal and work-related. Once, Hayner even stayed at Muir's apartment for a short period.

William "Bill" Doll, the Preservation Manager at the Maritime Park, supervised Muir. In Fall 2016, Doll ordered that Hayner be fired. Shortly thereafter, Hayner sent Muir a picture of a poster for the movie Kill Bill. At the time, Muir was on paternity leave and had not yet heard that Hayner had been fired. Without this context, Muir thought the text "quizzical," but "moved on in [his] phone, and didn't respond at that time." A few days later, upon hearing the news that Hayner had been fired, Muir realized the Kill Bill poster was an angry reference to the Preservation Manager. Muir conveyed his sympathy to Hayner by text: "Hope you can settle down and walk away for a bit. Please don't push the issue at the pier, for Karnell [another volunteer supervisor] and I if nothing else . . . lets [sic] have a beer sometime when I'm back in the world . . . ." And then, "Go giants!"

A couple hours later, Hayner – who was at a bar watching the San Francisco Giants play in a wildcard playoff baseball game – responded with a string of text messages:

> Dude talk about a pictures dual [sic]! As for Bill he is soon to die. No big deal we all do.
>
> Pitcher
>
> Bill is dead soon.
>
> Some people are good others bad. No one sees Bill as good. He must be eracticated [sic] to make life better for humanity.
>
> Remember the scene from the film Goodfellas. I have bought a bat for Bill that will make that scene seem peaceful. He is a zit on my

2

ass. Nothing to lose.

Muir responded, "No dude don't go there – don't talk like that. He's about to retire and be out of our hair. Don't put me in the position of having to deal with this! Just settle down . . . ."

Hayner continued,

> He needs [t]o die. Unfortunately many federal employees will soon.
>
> Bill is a person making the lives of many difficult. We of good faith must eradicate evil. Bill is evil and must be rid of. Sadly that will be mt [sic] responsibility. Kill Bill.
>
> Home run fuck bull [sic]
>
> @awe did it. .. leta go Giant's [sic]!!

Muir testified that the texts alarmed him that night. He was concerned that he didn't "get any verbal signal from Tim that he was just joking." He was "worried about particularly [his] fellow employees, and that they need to be at least alerted that there was a potential threat to their safety." Unsure of what to do, Muir "paced around the house a little bit. Spoke with [his] wife" about the conversation with Hayner, and then he "went to sleep . . . thinking [he] should, you know, sleep on it."

The next morning, Muir called Doll to alert him about the text exchange. Muir testified that he had called Doll out of an abundance of caution: "[I]f I was wrong, that was a bad thing to . . . have happen. And I felt like it wasn't up to me to decide to bury that, and to make that call. And I thought the responsible thing was to at least alert people that that was a possibility." Doll, who in turn was alarmed by Muir's account of the text messages, reported the conversation to his own boss and to the National Park Police. The Maritime Park held a staff meeting to alert people of the possible threat, and the police put up photographs of Hayner throughout the park.

That day, before finding out that Muir had reported the text exchange to Doll, Hayner texted Muir in apparent continuation of their dual baseball-work conversation from the night before:

> What an awesome game! WTF with the timing? 😏 This was the most important game of the season! Ok I'll only hit him if there is a zombie apocalypse and he is running through the streets screaming like the little girl he is. 😎

Later that day, the police arrested Hayner. Hayner subsequently texted Muir, lashing out at his former colleague and friend. He threatened to exact revenge by exposing rumors relating to Muir's personal life in court.

The government brought a misdemeanor charge against Hayner for violating 36 C.F.R. § 2.32(a)(1), Interfering with Agency Functions. The government alleged that Hayner "knowingly and purposefully threatened, intimidated, and intentionally interfered with [Doll], a National Park Service employee and agent engaged in an official duty, and on account of [Doll's] performance of an official duty, namely by sending a text message to a co-worker of [Doll's] in which defendant threatened to murder [Doll] with a bat." After a one-day bench trial, the magistrate judge found Hayner guilty. On appeal, Hayner does not dispute that the evidence was sufficient, at least on a deferential standard of appellate review, to support the magistrate judge's conclusion that he violated the regulation. But Hayner contends that his conviction violated the First Amendment because the government failed to prove beyond a reasonable doubt that his texts constituted a true threat.

II

The test for whether speech constitutes a true threat has two elements, one objective and the other subjective. *See United States v. Keyser*, 704 F.3d 631, 638 (9th Cir. 2012). The objective element, while framed somewhat differently from case to case, essentially asks whether a reasonable person would believe the threat to be real – that it is "a serious expression of intent to harm or assault." *United States v. Stewart*, 420 F.3d 1007, 1017 (9th Cir. 2005) (quoting *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058, 1074 (9th Cir. 2002) (en banc)). The second element asks whether the speaker "subjectively intend[ed] to threaten." *Keyser*, 704 F.3d at 638; *see Virginia v. Black*, 538 U.S. 343, 359 (2003). The government doesn't need to prove that the defendant actually intended to follow through on the threat. *Keyser*, 704 F.3d at 638. But the government must prove that the defendant intended for his threat to be taken seriously. *See id.*

4

In the typical criminal case, an appellate court reviews determinations by the factfinder – whether the jury or the court – with great deference. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Overton*, 573 F.3d 679, 685 (9th Cir. 2009).[1] If a defendant contends that the evidence was insufficient to convict, the appellate court will uphold the conviction even if the court disagrees with the verdict, so long as the evidence, viewed in the light most favorable to the government, could have allowed a reasonable factfinder to conclude beyond a reasonable doubt that the defendant was guilty. *Jackson*, 443 U.S. at 319. But in cases where a defendant has been convicted for engaging in speech, the standard is different. Although the appellate court continues to give deference to the factfinder on whether the elements of the offense of conviction were met, it must "make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984)). In other words, on a First Amendment issue, if the appellate court disagrees with the factfinder's assessment of the evidence, the court must overturn the conviction.[2]

The upshot, as it relates to this case, is that if Hayner were contending that the evidence was insufficient to meet the elements of the regulation prohibiting interference with agency functions, this Court would apply the typical deferential "sufficiency of the evidence" standard

---

[1] When a district court reviews a conviction by a magistrate judge on appeal, "[t]he scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58; *see* 18 U.S.C. § 3402; *see also United States v. Packard*, 236 F. Supp. 585, 586 (N.D. Cal.), *aff'd sub nom. Packard v. United States*, 339 F.2d 887 (9th Cir. 1964).

[2] Many circuits have refrained from applying *Bose Corp.*'s independent-review rule – sometimes referred to as the constitutional facts doctrine – to the determination of true threats. Therefore, in those circuits, the rule for reviewing a finding of a true threat is the same as the rule for reviewing other determinations made by the trier of fact – deferential review for sufficiency of the evidence. *See, e.g.*, *United States v. Wheeler*, 776 F.3d 736, 742 (10th Cir. 2015) ("This court has not relied upon *Bose* in 'true threat' cases . . . ."); *United States v. Clemens*, 738 F.3d 1, 14 (1st Cir. 2013); *United States v. Howell*, 719 F.2d 1258, 1260 (5th Cir. 1983) (per curiam); *United States v. Jeffries*, 692 F.3d 473, 481 (6th Cir. 2012), *abrogated on other grounds by Elonis v. United States*, 135 S. Ct. 2001 (2015); *United States v. Parr*, 545 F.3d 491, 497 (7th Cir. 2008).

of review. But Hayner's alleged criminal conduct was speech, and he contends that his conviction violated the First Amendment because the government failed to prove that his speech constituted a "true threat." Therefore, this Court must examine the evidence and decide whether it agrees or disagrees with the magistrate judge on whether the government met its burden.[3]

Although the parties mostly agree on the standard of review to be applied, there is one area of dispute. Hayner argues that this Court, in its independent examination of the record on the First Amendment question, must determine whether the government proved a true threat beyond a reasonable doubt. The government argues that the test is less favorable to Hayner, and that the conviction should be upheld so long as this Court is merely "convinced" from its independent review of the evidence that the texts constituted a true threat. The government does not specify whether it believes this is the same as the "clear and convincing" standard or some new standard that falls between "reasonable doubt" and "clear and convincing."

Hayner has the better argument. To start, the Due Process Clause of the Fourteenth Amendment requires that every fact necessary to convict a defendant be proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 315. Accordingly, the government seems to acknowledge that it was required at trial to prove beyond a reasonable doubt that Hayner's texts were a true threat. By definition, then, an independent, non-deferential review of the facts underlying Hayner's conviction involves an inquiry into whether the government did, in fact, prove a true threat beyond a reasonable doubt. Applying a lesser evidentiary standard here would be the

---

[3] There are exceptions – albeit ethereal ones – to the rule that appellate courts must conduct an independent review of the evidence when a defendant is convicted for engaging in speech. In addition to elements of statutory liability, "we defer to the jury's findings on historical facts[ and] credibility determinations." *Keyser*, 704 F.3d at 638 n.1; *see also Planned Parenthood*, 290 F.3d at 1070. In one case, the Ninth Circuit appears to have suggested in dictum that if an element of the "true threat" test is subsumed within the elements of the statute under which the defendant has been charged, the appellate court must, in conducting the First Amendment inquiry, defer to the factfinder on that issue. *See Keyser*, 704 F.3d at 639. That dictum is presumably wrong, because it would defeat the purpose of the requirement that appellate courts conduct an independent review of the record to ensure that the jury's verdict didn't violate the First Amendment. In any event, the parties agree that, on this record, it is proper for the Court to conduct a fully independent review. *See* Appellate Br. 7-8; U.S. Br. 16-17.

opposite of independent and non-deferential – it would allow a verdict to stand even if the appellate court did not believe that the government proved its case at trial. Thus, so long as there is independent appellate review of the true threat finding – the purpose of which is to ensure that the facts "constitutionally sustain the judgment," *New York Times v. Sullivan*, 376 U.S. 254, 286 (1964) – the Court must apply the same reasonable doubt standard as was applied at trial.

The Ninth Circuit has never explicitly held that the reasonable doubt standard continues to apply on appellate review in cases like this, and its decisions on this issue often use imprecise language. For example, when it upheld the conviction in *Keyser*, the Ninth Circuit stated, "Taken as a whole, this record *convinces* us that [the defendant] possessed the intent to threaten." *Keyser*, 704 F.3d at 639 (emphasis added). But in light of the discussion in the preceding paragraph, this statement should not be understood as announcing a lower evidentiary standard on appellate review. Rather, it is best understood as a colloquial reference to the reasonable doubt standard. After all, the Ninth Circuit's model criminal jury instructions define proof beyond a reasonable doubt as "proof that leaves you firmly *convinced* the defendant is guilty." Manual of Model Criminal Jury Instructions 3.5 (2018) (emphasis added).

III

The conviction is reversed because the government did not prove both elements of the true threat beyond a reasonable doubt. Although the government proved that a reasonable person would interpret Hayner's texts as a serious threat, it did not carry its burden on the subjective part of the test. That is, the government did not prove beyond a reasonable doubt that Hayner intended for his threats against Doll to be taken seriously and acted upon.

As an initial matter, the parties dispute the legal significance of the fact that Hayner did not send the texts directly to Doll. Hayner argues that for this reason alone the texts can't be deemed a true threat. The government, in turn, contends it is irrelevant who the messages were sent to. Neither side is right. As a practical matter, in most cases, if a defendant makes an objectively serious statement to Party A that he intends to harm Party B, Party B will find out

about the threat, and the defendant will have intended for Party B to hear about it. But it's conceivable that a defendant could communicate a serious threat to harm someone without intending for the object of the threat to hear about it. For example, the defendant in *Stewart* communicated a serious threat against the federal judge who sentenced him to his fellow inmate (an FBI informant). 420 F.3d at 1010-11. The defendant wanted to hire someone to "string the motherfucker up and cut her throat," and do it in a way that would inspire others to "do the same thing." *Id*. at 1011. The Ninth Circuit found that the defendant subjectively intended his statement to be a serious threat even though there seemed to be no evidence that the defendant meant the judge to hear about it. *Id.* at 1015. The absence of *this* sort of intent does not give the defendant First Amendment protection from criminal prosecution. But neither is it irrelevant. As an evidentiary matter, the fact that a defendant did not directly communicate with the object of the threat may, depending on the circumstances, make it less likely that he intended the statement to be taken seriously. *See, e.g.*, *United States v. Fenton*, 30 F. Supp. 2d 520, 524-25 (W.D. Penn. 1998).

      In the context of this case, the fact that Hayner texted Muir, rather than Doll directly, matters a great deal. It's true that Muir was Hayner's former supervisor at the Maritime Park, and, at the Park, Muir reported to Doll. But Hayner and Muir were not just colleagues, they were friends – close enough, even, that Hayner had once slept at Muir's place. Hayner's texts were peppered with comments about the baseball game he was watching from a bar with another friend. This casts doubt on the government's assertion that Hayner meant the messages to be taken seriously and acted upon by Muir.

      The government emphasizes that Muir responded to Hayner's initial texts about killing "Bill" by urging Muir to "settle down" and imploring: "Don't put me in the position of having to deal with this!" The fact that Hayner immediately responded with "he needs to die," according to the government, is reflective of an intent that Muir take the texts seriously. If it were indeed clear that Hayner had received Muir's plea to "settle down" before sending the texts that appear immediately thereafter on the text chain, the government might have a stronger case. But there is

8

no evidence in the record as to when each individual text was sent. When people text back and forth, messages can appear sequential even though the conversation's participants are effectively typing, and hitting the "send" button, concurrently. Thus, there is some doubt that Hayner (who, by the way, did not testify) was in fact responding to Muir's warning, rather than simply continuing his tirade. It seems equally likely that Hayner's text sent the following day – in which he said, "Ok I'll only hit him if there is a zombie apocalypse and he is running through the streets screaming like the little girl he is" – was his first true response to Muir's request that he stop texting about killing Doll.

Moreover, the content of this next-day reply tends to further undermine the idea that Hayner intended for his texts to be taken seriously. If Hayner truly wanted Muir to think he was going to harm Doll, you'd expect Hayner to continue to insist that he was going to "kill Bill." By the same token, if Hayner had truly intended the prior night's texts to be a threat but realized the next day that he ought to backtrack, you'd expect him to say something like, "sorry about that, I won't do anything," or "don't worry man, I was just kidding." Instead, Hayner first commented on the baseball game. And then he seemed to continue with the same odd vengeful tough-guy role-play from the night before, albeit a bit dialed back, telling Muir that he'd only hit Doll if there were a zombie apocalypse. This response, in itself, casts further doubt on the government's assertion that Hayner considered the dialogue to be a serious one.

Finally, later that day (that is, the day after the threatening text exchange), Hayner texted Muir again, this time after he had been arrested. The government makes much of the fact that Hayner – again super angry, this time at what he saw as a betrayal of his trust – "threatened" to air Muir's infidelities in open court. The government appears to argue that these threats betray a pattern of threatening behavior, making it more likely that the texts from the night before constituted a true threat. The best that can be said for the government is that a person's willingness to threaten to expose someone's misconduct might be mildly probative of his willingness to make a serious threat of violence. But in light of the other evidence discussed above, which creates a reasonable doubt about Hayner's subjective intent to threaten, this does

not come close to allowing the government to meet its burden of proof.

IV

If the standard of review were the same as in many other circuits (that is, deferential sufficiency-of-the-evidence review), the Court would affirm the conviction. On an independent review of the record, however, the Court concludes that the government did not prove beyond a reasonable doubt that Hayner intended for his threat to be taken seriously. Furthermore, even applying the government's proposed burden of proof, the Court is not "convinced" that Hayner intended for his threat to be taken seriously. Accordingly, the conviction is reversed.[4]

**IT IS SO ORDERED.**

Dated: September 26, 2018

VINCE CHHABRIA
United States District Judge

---

[4] Because the Court reverses the conviction on First Amendment grounds, it need not reach Hayner's additional argument that the information was inadequate.